Eileen MADISON, Administratrix of the
Estate of E. G. Madison, Appellant
(Defendant),

v.

Russell MARLATT, Appellee (Plaintiff).

No. 5285.

Supreme Court of Wyoming.

Nov. 13, 1980.

Douglas G. Madison and John E. Masters, Dray, Madison & Thomson, P.C., Cheyenne, on brief; W. Perry Dray, Cheyenne, for appellant.

Lowell H. Fitch (argued), and Gerald F. Murray, Murray & Fitch, Torrington, on brief, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

PER CURIAM.

In his appeal, appellant defendant presents the court with five challenges to the judgment of the district court entered on February 6, 1980 following a jury trial and verdict in favor of appellee plaintiff. E. G. Madison, the defendant in the district court died on November 15, 1979 after trial but before judgment. His administratrix was regularly substituted. First, the question is raised as to whether the language of the "option clause" appearing in the lease executed by the parties was sufficiently plain and unambiguous so as to enable a court to decide its meaning as a matter of law. Second, appellant argues that where an option contract for the sale of realty was silent as to the type of deed to be passed upon the exercise of the option, the demand for a warranty deed constitutes a counter offer, and hence, a rejection of the offer contained in the option. Third, appellant contends that in view of appellee's knowledge of Madison's limited title, the refusal of co-owners to sell and the absence of a showing of bad faith on Madison's part, the benefit of the bargain[1] was not the appropriate measure of damages. Fourth, under Rule 703, W.R.E., appellant challenges the district court's decision that the testimony of appellee's expert witness was admissible. And finally, appellant questions the propriety of recalling a jury following its discharge in order to clarify the meaning of its verdict.

We will reverse and remand for a new trial on the basis of an improvident entry of partial summary judgments related to appellant's third issue raised on appeal.

The dispute, here, arises out of a three-year written farm lease agreement, entered into by Russell and Alice Marlatt, lessees, and E. G. Madison, lessor, (Madison) on October 10, 1971. Paragraph 21 of said lease, among other things, provided that:

"With this lease the Lessor grants to Lessee a prior option to purchase place at an agreed price of $40,000.00, provided option is exercised and accepted within the same period as this lease."

Though Verl Guffey and Madison owned the property as tenants in common, there is no claim in this appeal that Guffey had authorized Madison to enter into an option agreement with appellee; Guffey is not a party to the action. We will more fully develop the facts in this regard in our discussion of our reason for reversal.

Following a transfer by Alice Marlatt to him of "all her interest in and to a lease * * together with the option to purchase said property," appellee, on February 27, 1975, gave written notice to Madison of his desire to exercise the alleged option by tendering a cashier's check for $40,000.00, the purchase price, and demanding in exchange "a good and sufficient Warranty Deed." When Madison refused to convey the leased property, appellee, on April 14, 1975, instituted the action in district court, seeking damages for a breach of a contract.

In the course of the seemingly interminable court proceedings, the district court granted appellee two partial summary judgments. The first one, issued April 6, 1976, held that no genuine issue of material fact existed except as to the amount of damages suffered as a result of the breach. On September 20, 1979, during the course of the trial, the district court issued the second partial judgment. It held that the letter from lessee to lessor dated February 27, 1975, was "a sufficient manifestation of an

---

1. The difference between the contract price and the fair market value.

election consistent with the power of acceptance created by the grant of option," and further that the appropriate measure of damages was "Loss of Bargain."

During the trial, appellee called a real estate appraiser to testify as an expert with regard to his valuation of the leased property. Following the testimony, Madison objected and asked that it be stricken from the record, claiming that the facts relied on by the expert were not of the sort reasonably relied upon by experts in the particular field, as required by Rule 703, W.R.E. The district court, however, denied the motion and held the testimony admissible.

Finally, on September 21, 1979, at 1:57 p.m., the case was submitted to the jury; a special verdict was returned at 10:43 p.m. Following the discharge of the jury, the trial judge, along with the parties, became concerned that the verdict might have contained inconsistencies. Within five minutes of its discharge, the jury was reassembled. After a brief explanation of the problem by the judge, the jury was sent out in order to reconsider its verdict. After deliberating less than ten minutes, the jury returned the special verdict with one correction effectively eliminating any inconsistency. Final judgment for appellee was in the sum of $32,751.00, the amount of damages found by the jury.

We will premise our reversal on the improper granting of the two partial summary judgments entered by the trial judge. They were too broad inasmuch as there existed issues of fact which arose out of the deficiency of the title of Madison to the premises, and which factual issues were material to the resolution of the complaint over and above the issue as to the *amount* of damages.

The effect of partial title in Madison was argued to the trial court in connection with the motion for the first partial summary judgment. Such judgment was rendered on April 6, 1976. The trial court there found:

"* * * that no triable issue of material fact exists except for the issue of the *amount* of damages for which judgment should be granted * * *." (Emphasis added.)

After a two day hearing on motions for another partial summary judgment, the trial court made the following finding, among others, in the September 17, 1979 partial summary judgment:

"* * * that the plaintiff denies knowledge of the inability of the defendant to convey title to the property, although it is unrefuted that on June 30, 1971, prior to the execution of the lease and option that correspondence was directed to the plaintiff by the Farmers Home Administration giving notice that a co-owner was involved in the transaction; at all times the fact of co ownership with Verl Guffy [sic] and the defendant was a matter of public record in the records of Goshen County, Wyoming * * *."

The legal implications resulting from the deficiency in his title are now argued by appellant in connection with the two issues framed as follows:

"If the option language is silent as to various terms, does demand for a 'good and sufficient Warranty Deed' constitute [sic] a counter offer thereby rejecting the original offer?

"In view of Plaintiff knowledge of Defendant's limited estate, the refusal of the co owners to sell, and of Defendant's lack of intent to create more than a right of first refusal, was Plaintiff entitled to damages measured by the 'benefit of the bargain' rule?"

Accepting the trial court's determination that an option was given and properly exercised and that Madison breached his agreement by not conveying the premises to appellee, the question remains as to the measure and amount of damages. There are two aspects to this question: (1) effect of the knowledge on the part of appellee—vendee at the time of contract that Madison had only partial title to the premises and had no intention of acquiring full title; and (2) the existence or nonexistence of an issue of fact concerning such knowledge and intention.

With reference to the second aspect, the existence of a factual issue is evidenced by

the language of the second partial summary judgment, supra, and by the depositions of each party which were in the record at the time of the first partial summary judgment wherein appellee stated that he first learned of a co-owner's interest in "the second year of the written lease," and wherein Madison stated that the purpose of the lease with option was only to enable appellee to meet FHA requirements for a loan to be secured by other property of appellee, and that at the time appellee "picked up" the lease at Madison's office,

" * * * he was told at that time that the option didn't amount to much, but I thought it probably–when FHA approved the loan they approved it on condition that I give a three–year lease preferably with an option to purchase. Now I told him I couldn't give him a *bona fide option* because I had a partner on the place, and Russell was told this the day he picked up the lease." (Emphasis supplied.)

Also, at the hearing on the second motions for partial summary judgments, witness Franks testified that he had told appellee before the premises were leased that they were owned partially by one other than Madison, and witness Gerstner testified that he had furnished similar information to appellee before the premises were leased. Madison testified that appellee first indicated an intention to exercise the option when Madison told him he contemplated "breaking" the lease because of appellee's poor husbandry. The co-owner of the premises,[2] Verl Guffey, stated in a deposition taken on October 14, 1977, that Madison did not have authority to sell his, Guffey's, interest in the premises and that he, Guffey, did not want to sell such interest.

■ In view of appellee's denial of knowledge, at the time of execution of the lease, of co–ownership of the premises and Madison's testimony that the sole purpose of the option was to satisfy FHA requirements on an application by appellee for a loan to be secured by other property of his,

there were issues of fact as to such knowledge and intention. If such issues of fact were material to the measure of damages, then both of the partial summary judgments were improper, because additional factual issues existed; these questions of fact should have been resolved by the jury. Neither the trial court nor the supreme court have a duty nor a right on a motion for summary judgment to resolve any existing issues of fact. *Knudson v. Hilzer*, Wyo. 1976, 551 P.2d 680.

■ Although there is law to the effect that a vendee cannot recover damages for breach, or have specific performance, of a land sale contract with a vendor having only partial title to the premises in absence of existence of a principal agent relationship between the owners thereof (see e.g., *Gatzemeyer v. Vogel*, 8th Cir. 1976, 544 F.2d 988), the general rule is as stated in 92 C.J.S. Vendor and Purchaser § 576, p. 617 (1955):

"A failure or refusal on the part of the vendor to convey the realty contracted for is ordinarily a breach of the contract for which he is liable in damages. *On the other hand, where a purchaser knew that title was in another, and the vendor had acted in good faith in entering into the contract, damages are not recoverable. * * *"* (Emphasis supplied.)

When a vendee enters into a contract with knowledge of the vendor's defective title, many jurisdictions measure the damages by the amount of the purchase money paid, with interest, as is done in actions for breach of a covenant for quiet enjoyment or warranty in a conveyance. Other jurisdictions use the "loss of bargain" rule to compute damages regardless of the parties' good faith. This allows further recovery of an amount equal to the difference between the actual value and the contract price. Annotation: Measure of recovery by vendee under executory contract for purchase of real property where vendor is unable or refuses to convey, 48 A.L.R. 12,

2. Verl Guffey and Madison were co–owners of 75 percent of the premises. Madison owned the other 25 percent in an estate with his wife.

supplemented 68 A.L.R. 137; Annotation: Vendee's right to recover amount paid under executory contract for sale of land, 59 A.L.R. 189; Annotation: Vendor and Purchaser: Recovery for loss of profits from contemplated sale or use of land, where vendor fails or refuses to convey, 11 A.L. R.3d 719.[3]

In the past, the loss of bargain rule has been applied in Wyoming as the measure of damages. But in those instances it was undisputed that the breach was wrongful and that the vendee had no advance knowledge of any defect in title. *Reed v. Wadsworth*, Wyo.1976, 553 P.2d 1024. See *Smith v. Gorsuch*, 1927, 36 Wyo. 430, 256 P. 664. Damages in the nature of adjustment of the purchase price was held proper in *Flygare v. Brundage*, 1956, 76 Wyo. 350, 302 P.2d 759, where vendor, in good faith, sold a greater quantity of land than he actually owned.

Thus, the question we, for the first time, must answer here is whether the "benefit of the bargain" is the proper measure of damages if the vendee knew, at the time of the execution of the agreement to convey, that vendor did not have full title to the premises covered by the agreement or if vendee knew, or had reason to know, that vendor had no intention to acquire such title.

The rationale behind the benefit of the bargain rule is to compensate the vendee for his loss.[4] But where the vendee entered into a contract fully aware that the vendor may be acting beyond the scope of his power and that, as a result, the conveyance may not become an accomplished fact, in reality all he has is a hope that some day the property may be his. Thus the benefit of the bargain rule provides him with a windfall and it merely punishes the vendor. If vendor knew the vendee could not deliver the recited considerations *and neither of them expected him to do so* the situation is not one created only by fault of vendor in not providing for an unexpected contingency. Vendor was not "speculating" without liability on his part. The facts appear to be that both parties knew from the first that the conveyance would not be made and liability was not contemplated, though the final decision in that regard should be made by a fact finder. Specifically, if the jury finds that the only reason for the option was to enable appellee to meet FHA requirements and both parties knew Madison had only partial title and neither expected a conveyance to be made under the option, the reason for applying the "benefit of the bargain" measure of damages did not exist. *Garcia v. Yzaguirre*, Tex.Civ.App.1919, 213 S.W. 236; *Long v. Brown*, Tex.Civ.App. 1979, 593 S.W.2d 371; *Diamond Central, Inc. v. Gilbert*, 1961, 13 A.D.2d 931, 216

3. See, 92 C.J.S. Vendor and Purchaser § 572, et seq. (1955); 77 Am.Jur.2d Vendor and Purchaser § 519, et seq. (1975); Dobbs on Remedies, § 12.7 (1973), concerning effect of factors such as refusal when ability to convey is present, inability due to deficiency in quantity, inability due to deficiency in quality of estate, effect of lack of knowledge by vendor or vendee or both, etc.

4. The logic behind the "benefit of the bargain" measure of damages is well said in *Beck v. Staats*, 1908, 80 Neb. 482, 114 N.W. 633, 635: " * * * And where a party by his contract undertakes to convey property and is rendered unable, or refuses to do so, the law will require him to respond in full compensatory damages; and it makes no difference whether he willfully disregards his contract, or is prevented through no fault of his own from conveying the title called for by his contract. His liability is created by the contract. He agrees to convey. The contract is necessarily reciprocal. Is there any reason in law or in equity for relieving a grantor because he is disappointed in not obtaining title, any more than there could be for relieving a grantee because he had failed, through no fault of his own, in obtaining the purchase price at the appointed time? It was the duty of the defendant and his privilege to provide in his contract against obstacles, and, if he undertakes without this precaution to convey title belonging to another, he does so at his peril. Any other rule would permit one to speculate in reference to the property of another without incurring any liability on his own part, but at the same time bind his grantee irrevocably. The real issue of fact in the case at bar is whether the parties hereto made their contract contingent upon defendant's obtaining the outstanding title. This issue was submitted to the jury under proper instructions. * * *"

N.Y.S.2d 609; *Kessler v. Rae*, 1972, 40 A.D.2d 708, 336 N.Y.S.2d 680.

■ Since the purpose of that law is to compensate not punish, there is no reason to apply the "benefit of the bargain" rule. Therefore we conclude that where the vendee is aware of the faulty state of the vendor's title, he is only entitled to purchase money paid out—that is, his actual damages.

Since the issue was raised in motion for summary judgment, appellant's claim that the appellee knew of the defect in his title must be treated as true, credibility is not tested on a motion for summary judgment. Therefore, we must reverse the trial judge's determination to apply the "loss of bargain rule" as the measure of damages.

We will reverse and remand for presentation to the jury of the issues of fact as to whether or not appellee knew, at the time of the execution of the lease, that Madison had only partial title to the premises and as to whether or not the parties intended that the conveyance would not be made, the measure for damages to depend upon the determination of such issues.

■ There are other issues we will discuss in that the case is being remanded for a new trial. It is proper for the supreme court to decide incidental questions which are bound to arise again on a new trial, and decisions thereon cannot be regarded as obiter dictum. *Chicago & N. W. Ry. Co. v. City of Riverton, Fremont County*, 1952, 70 Wyo. 119, 247 P.2d 660.

■ The first issue presented in this appeal will be of primary concern upon reconsideration and requires us to focus our attention on the rules relating to contractual interpretation. The law of this state is well settled that, when construing a contractual agreement, "the meaning of an instrument is to be deduced only from its language if the terms are plain and unambiguous." *Bowen v. Korell*, Wyo.1978, 587 P.2d 653, 656. When such is the case, then it falls within the province of the court to

construe the contract as a matter of law. *Shepard v. Top Hat Land & Cattle Co.*, Wyo.1977, 560 P.2d 730. However, when the terms of the contract are unclear on their face and doubt arises from the contract itself as to what the parties meant, then extrinsic evidence becomes admissible in order to establish the parties' original intent and, thus, aid the court in construing the contract accordingly. As a result, a summary judgment is an inappropriate means of construing a contract only when the contract is ambiguous on its face and the extrinsic evidence, admissible as a result of said ambiguity, raises a real issue of fact requiring resolution at trial. *Meuse–Rhine Ijssel Cattle Breeders of Canada Ltd. v. Y Tex Corp.*, Wyo.1979, 590 P.2d 1306, 1311.

In the present case, the district court, in a March 17, 1976 letter opinion announcing its decision to grant the appellee a partial summary judgment, concluded that the plain meaning of the purported option clause was indeed a grant to the lessee (appellee) of an option. This holding must be upheld unless we find that some doubt exists as to whether the lease did in fact give the lessee an option to purchase the leased property. *Meuse · Rhine Ijssel Cattle Breeders of Canada Ltd. v. Y · Tex Corp.*, supra.

■ In Wyoming, an option contract has been held to be a unilateral contract, in which the optionor promises not to revoke an offer to sell for a specific period of time.[5] The contract becomes a bilateral contract, binding upon both parties, if within the specified time period the optionee elects to accept the offer. Thus, the essential difference between an option and an offer to sell is the option's irrevocable nature. *Braten v. Baker*, 1958, 78 Wyo. 273, 323 P.2d 929, 931.

■ For an option to exist, the optionee must have the vested exclusive right, for a set period of time, to create a binding bilateral contract, and "the optionor must

---

**5.** Consideration specifically for the granting of an option is necessary. However, consideration is presumed when a purchase option is contained in a lease. *Braten v. Baker*, Wyo. 1958, 323 P.2d 929, 931.

have no choice but to abide by the terms of the commitment." *Covey v. Covey's Little America, Inc.*, Wyo.1963, 378 P.2d 506, 517. Since, in order to satisfy this requirement there can be no necessity for further negotiations, the indicia of an option concern the particularity of its underlying offer. *Crockett v. Lowther*, Wyo.1976, 549 P.2d 303, 311.

In the contractual provision before us, the offer to sell is quite specific. The lessee, for the life of the lease has the right to purchase the leased property for $40,000.00. If the lessee elects to accept this offer, no further negotiations are necessary. He merely pays lessor $40,000.00 and in return receives title to the property.

Appellant's argument that the provision is ambiguous is unconvincing. His contention is that the terms "prior option" and "exercise and acceptance" raise doubt as to its meaning. He reaches this conclusion by noting that the court must give import to every word if possible. *Rossi v. Percifield*, Wyo.1974, 527 P.2d 819, 820. And here, if the court finds an option, then no meaning has been assigned to the words "prior" and "accepted." Appellant then suggests that meaning could be given these words if the disputed clause were construed to give the lessee the right to make an offer of $40,-000.00 if the property was put up for sale during the term of the lease. However, such a construction, though, giving more significance to the words "prior" and "accepted," would in effect make the whole clause meaningless and inconsistent with the dominant word "option" used twice in the questioned clause, and thus is unacceptable.

■ Our conclusion that the clause undoubtedly creates an option is further bolstered by the statement of a fixed price. Construing this together with the rest of the clause as an option is natural and proper. However, if construed in any other manner, then even though lessor was *uncertain* as to whether he desired to sell the land during the course of the lease, (three years) he was *certain* of the price at which he would like to sell, regardless of any material intervening changes in condition. See, *Tantum v. Keller*, 1924, 95 N.J.Eq. 466, 123 A. 299, 300. Though such situation may theoretically be possible, it is too speculative in nature to raise any doubts as to the plain meaning of the clause in question. Therefore, we agree with the trial judge's ruling that paragraph 21 of the lease between the parties created a binding option granting appellee the power of acceptance.

■ The second issue that was raised by appellant requires a familiarity with the area of contract law regarding the procedure necessary to accept an offer. To be effective, an acceptance must be unconditional; it cannot be combined with any conditions which materially vary the terms of the offer. If such conditions are included, the acceptance is treated as a rejection of the original offer and acts as a counter offer vesting in the original offeror the power of acceptance. *Trautwein v. Leavey*, Wyo.1970, 472 P.2d 776, 779.

■ An election to exercise an option, operates as an "acceptance of the optionor's offer of sale"; thus, the law of acceptance governs such elections. *Braten v. Baker*, supra, 323 P.2d at 934. Therefore, as in the case of an acceptance, an election cannot be coupled with any conditions which alter the terms of the offer.

In the present case, appellee notified Madison by letter of his election to exercise the option contained in the lease to purchase the property. However, the notification contained a demand for "a good and sufficient Warranty Deed." Since the option contained no mention of the type of deed to be conveyed, lessor claims the lessee's election included a condition which materially varied the terms of the offer contained in the option, and thus constituted a counter offer.[6]

6. In her brief, appellant argued that because the lease in question was silent as to the character of the deed to be used to convey the offered property, the law will not only require that the deed be sufficient to convey marketable title, but will read the option as offering the

With this proposition, we cannot agree. Where an option is silent as to the type of deed to be conveyed upon election, the terms of the contract are obviously unclear. As a result, extrinsic evidence may be considered in order to search out the meaning of the provision. *Bowen v. Korell*, supra, 587 P.2d at 656. But even where extrinsic evidence is admissible to establish the intent of the parties, a summary judgment may be appropriate when the evidence fails to raise an issue of fact requiring resolution at trial. *Meuse -Rhine -Ijssel Cattle Breeders of Canada Ltd. v. Y- Tex Corp.*, supra, 590 P.2d at 1311.

In the present case, the issue came before the district court on a motion for summary judgment, seeking a determination that appellee's letter of February 27, 1975, was a sufficient manifestation of election consistent with the power of acceptance vested in him. Though Madison argued against the motion claiming the court should construe the option as offering only a quitclaim, not one shred of evidence was presented that such was the intent of the parties; all the evidence went the other way.[7] Therefore, we must agree with the district court's conclusion that no issue of fact was raised, and that the option should read as offering a warranty deed, the ordinarily accepted document to transfer marketable title.

The next issue that we must discuss involves Rule 703, W.R.E., which states:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

This rule is a drastic alteration of the common–law evidentiary rules, and was designed to liberalize admissibility of expert testimony. Comment, Wyoming Rules of Evidence 701 -706: Opinions and Expert Testimony, 13 Land & Water L.Rev. 975, 980 (1978). As stated by one commentator:

"Underlying Rule 703 is the idea, sensible in itself, that an expert is likely to understand better than a court the quality and nature of data essential to support an opinion in his own field. Yet Rule 703 does not abdicate judicial responsibility to the expert, for it leaves room for rejection of testimony if reliance on the facts or data is unreasonable * * *." Louisell & Mueller, Federal Evidence, § 387 (1979).

When reviewing holdings of trial courts concerning the admissibility of evidence, we have consistently maintained that such matters are within the sound discretion of the trial court. Unless an apparent abuse of this discretion is shown, the trial court's decision will remain undisturbed. *Peterson v. State*, Wyo.1978, 586 P.2d 144, 154; *Daellenbach v. State*, Wyo.1977, 562 P.2d 679, 682.

We see no reason to discard this criterion with respect to Rule 703, supra. The trial judge is in a much better position to evaluate the underlying basis of expert testimony, and to determine the reasonableness of the reliance on it in light of the standard practice of experts in the particular field:

"Sometimes determining the reasonableness of reliance upon underlying data involves the exercise of analytic skills and tact which is routinely expected of trial judges. And in fact a trial judge is usually well suited to determine whether the underlying data are extensive enough to support an opinion, or so sparse that the opinion is in reality wishful thinking, guesswork, or speculation which should be excluded. * * *" Louisell & Mueller, Federal Evidence, § 389, supra.

---

least burdensome kind of transfer necessary to give marketable title, i.e., a quitclaim. Therefore, any attempted acceptance which demands more than a quitclaim is a counter offer.

7. Of particular import is Madison's admission in a March 5, 1979 hearing before the district court that "if Verl Guffey had agreed that we would sell and I had agreed that we would sell, we would have given it, the two of us would have given a warranty deed."

In the present case, Madison stipulated to the witness' qualifications as an expert appraiser. Then, following a rigorous cross examination, Madison attacked the expert's testimony under Rule 703, W.R.E., "based on his examination and cross-examination and what is done by—what we [the appellant's attorneys] believe is done by experts in this field." [8] No expert testimony was introduced by Madison to support this, by showing either what normally provides the basis for an expert's appraisal of a piece of property's value or how the opinion of appellee's expert failed to meet the standards of his profession. In view of such a glaring omission, we find no evidence that the trial court abused its discretion in holding the expert testimony admissible. [9]

Though it has serious implications, [10] we will not consider the final question presented in that it is unlikely that it will arise again in this case and is unnecessary to a disposition of the appeal. When a question posed to the supreme court, while of academic interest and potentially determinative in certain instances, is not requisite to adjudication of the case, it will not be decided. *Wallace v. Casper Adjustment Service,* Wyo.1972, 500 P.2d 72; *Druley v. Houdesheldt,* 1956, 75 Wyo. 155, 294 P.2d 351, *reh. den.* 75 Wyo. 166, 296 P.2d 251. We do, however, lay down this caveat: before discharge of a jury, particularly when a special verdict has been returned, a trial judge should recess for a period of time in order that court and counsel may examine the verdict for inconsistencies and irregularities.

Reversed and remanded for a new trial.

8. In the opinion of appellant's attorneys, the expert's testimony was flawed because

"[h]e didn't base his opinion of the value of the irrigated land on soil conditions that were—other than by personal observation, and we're [the appellant's attorneys] hesitant to say that was of much value since he examined twelve ranches in roughly a day and a half. He didn't personally confirm all the comparable sales and the person who did * * * is not available for this Court to examine as to his work on that. He didn't inspect interior improvements of the Madison place. And finally, which I [again appellant's attorney] think is the most persuasive, is he failed to—well, he used the Basin Electric sale and has failed to make an adjustment for the fact that that was an industrial type sale. * * *"

9. Relevant here is Instruction No. 13a, which read in part:

"You must determine the fair market value of the subject property only from the opinions of the witnesses who have been permitted by the court to express their opinion of such market value.

"Thus, you may not find the market value of the subject property to be either less than or more than that testified to by the witnesses who have been permitted to express their opinions on such matters.

"An expert appraiser or any witness who has knowledge of the market value of the subject property may give his opinion of such market value and the reasons for such opinion.

"Evidence which has been received from witnesses as to reasons for their respective opinions of value, and all other evidence concerning the subject property and other properties [sic], including your view of it or them, is to be considered by you only for the limited purpose of enabling you to understand and weigh the testimony of the witnesses as to their opinion of such market value.

"You should consider each such opinion and should weigh the qualifications of the witness and the reasons given for his opinion. Give each opinion the weight to which you deem it entitled.

"You must resolve any conflict in the testimony of the witnesses by weighing each of the opinions expressed against the other, taking into consideration the reasons given for the opinion, the facts relied upon by the witness, his relative credibility and his special knowledge, skill, experience, training, and education. * * *"

10. See Anno., 66 A.L.R. 536, "Right to reassemble jury after discharge, or after sealing verdict and separating, to correct or amend verdict or supply defect in rendition."